KARLA J. CARRAHER, APPELLEE, V.
DENNIS M. CARRAHER, APPELLANT.
607 N.W. 2d 547

Filed March 14, 2000.   No. A-98-1176.

Jeanelle Kleveland, of Kleveland Law Offices, for appellant.

John H. Sohl, of Edstrom, Bromm, Lindahl, Sohl & Skokan, for appellee.

HANNON and SIEVERS, Judges, and BLUE, District Judge, Retired.

SIEVERS, Judge.

This appeal involves the removal of a child from Nebraska to Colorado by his mother, Karla J. Carraher, the custodial parent. The father, Dennis M. Carraher, appeals the decision of the district court for Saunders County, which denied his application for modification of the parties' divorce decree to grant him sole custody of the child, as well as the court's order granting Karla's application to remove their child from Nebraska to Colorado.

## I. BACKGROUND

Dennis and Karla were married in May 1989. One child, Thomas, was born to the couple on November 1, 1989. The parties were divorced pursuant to a decree filed July 31, 1992. The parties had joint legal custody, with Karla having physical custody of Thomas. Dennis was granted visitation every other weekend, one evening during the week, 2 weeks each summer, and various holidays. The decree incorporates the parties' property settlement agreement, which includes a provision regarding the removal of Thomas from Nebraska, which said that "if in the future the wife, as parent having physical possession of the minor child, decides to move from Nebraska, the wife shall make application to the Saunders County District Court prior to the time of such move."

Karla and Thomas resided in an apartment in Wahoo, Nebraska, for the first 6 months after the parties' divorce, until she bought a house in Weston, Nebraska. They lived in the house for 5 years and then moved to Wahoo where they lived with her boyfriend, Manual Brazil, for 3 months before moving to Colorado in September 1997.

Karla worked at several part-time jobs over the years. Prior to moving to Colorado, she worked at M.E. Collins Contracting, earning approximately $100 per week. She also received $500 a month from renting out the house she owned in Weston. In addition, Karla received approximately $250 per month in child support from Dennis. Karla testified that she was able to live adequately on her sources of income while in Nebraska.

Thomas attended school in Weston and briefly in Wahoo at the start of the 1997 school year, and he was involved in other activities, including swimming and baseball. Karla is not abusive toward Thomas, and for punishment, she deprives him of something or sends him to his room. Dennis testified that Karla was very capable with Thomas and keeps him clean and healthy. It appears that Karla and Thomas have a loving, stable relationship.

Karla had a son, John, in 1985 from a prior marriage. John lived with Karla and Thomas until 1996, when John wanted to move to his father's farm near Spalding, Nebraska. Karla and Thomas see John about once a month.

Dennis lives near Wahoo on a farm and is employed by the State of Nebraska as an electrical inspector. Dennis often takes Thomas to see relatives in Spalding during his visits. Other activities that Dennis and Thomas do include hunting, riding motorcycles, camping, fishing, swimming, going to car races, and playing games. The evidence shows that Dennis and Thomas have a very good relationship. Dennis is not abusive toward Thomas.

Over Labor Day weekend in 1997, Karla, John, and Thomas went to the Estes Park area to visit Karla's sister. They returned on Monday, and on Tuesday, Karla made the decision to move to Colorado. She testified that she had been considering moving there for some time, but did not think that the move would actually occur. On September 4, 1997, Karla moved to Estes Park and took Thomas with her without the court's or Dennis' approval. Although Karla testified that she tried to contact Dennis to let him know where she and Thomas were going, she was unable to locate him, as he was on vacation in Colorado. Therefore, she wrote him a letter. On September 6, Dennis returned from his vacation and attempted to contact Thomas at Brazil's house. The next day, he became concerned and began making telephone calls. He found out on September 8 that Karla had taken Thomas to Colorado.

Dennis filed an application to modify the decree on September 8, 1997, and requested that he be awarded sole custody of Thomas. Also on September 8, Dennis filed a motion for ex parte temporary custody to allow him to obtain custody dur-

ing the pendency of the application to determine Thomas' custody. On September 9, the court awarded Dennis temporary custody. On September 10, Karla filed a motion to quash the temporary custody order together with an application for leave to remove Thomas from Nebraska. The court granted Karla's motion to quash, vacated the temporary ex parte custody order it had entered the day before in favor of Dennis, and allowed Karla to remove Thomas to Colorado pending the final determination of the case. A trial was not held on Dennis' application to modify and Karla's application to remove until April 16, 1998, and the trial court did not decide the case until October 9, 1998, over 1 year after Karla had taken Thomas and moved to Colorado.

Karla testified that she moved to Colorado in order to end her relationship with Brazil. She stated that Brazil was not abusive toward her or Thomas, but their arguments had grown more frequent and intense. Karla said that she feared the situation would worsen and violence would develop and that she did not want Thomas exposed to this situation. Both she and Brazil testified that if Karla had stayed in Nebraska, Brazil would have followed her. Therefore, Karla decided that in order to permanently end their relationship, she and Thomas should move to Colorado.

Karla began working as a waitress at Ed's Cantina in Estes Park on September 16, 1997, and currently earns about $350 per week. This is approximately twice the amount she made waitressing in Wahoo at previous jobs. However, she no longer receives the $500 a month rental income from the house she owned in Weston. She and Thomas rent a two-bedroom house for $600 per month in Estes Park. Karla stated that living in Estes Park is better than living in Nebraska because the area is more beautiful, there are more job opportunities, and there are more activities for children. In addition, she considers the schools to be better, and Thomas has been performing very well in school in Colorado. Karla has a sister who lives in Allenspark, Colorado, which is about 20 miles from Estes Park.

Dennis stated that since Karla's move to Colorado, visitations with Thomas have deteriorated due to the long drive involved in order to see Thomas. He has been able to see him approximately

once a month, and the travel impacts on the time and quality of their visits. Dennis and Karla have been meeting halfway between Wahoo and Estes Park near North Platte, Nebraska. Each parent drives approximately 4 hours each way, and the trips cost Dennis about $60 round trip for gas and food. Dennis is worried about the driving time, road conditions, and traffic on the interstate and the impact of these things on Thomas.

Dennis testified that he has concerns regarding Karla's parenting of Thomas, although they are not related to her actual care giving to Thomas. Karla has moved several times and has held various jobs since the parties divorced. Dennis asserts that this is evidence of Karla's instability and impulsive decision-making. Aside from an attempted reconciliation with Dennis, Karla has had only the one relationship with Brazil since the parties' divorce. Dennis admitted that his application for modification had nothing to do with Karla's relationship with Brazil. Dennis is concerned about Thomas' safety in Estes Park because she lives on one of the main roads in Estes Park and there are many visitors to the area. In addition, Dennis thinks Estes Park is too far away from relatives in Nebraska.

The trial court granted Karla's request to move Thomas to Colorado and denied Dennis' request for sole custody of Thomas.

## II. ASSIGNMENTS OF ERROR

Dennis assigns as error that the district court (1) allowed Karla to remain temporarily outside the jurisdiction with Thomas during the pendency of the case, (2) allowed Karla to move Thomas from Nebraska, and (3) failed to change sole custody of Thomas to Dennis.

## III. STANDARD OF REVIEW

In the absence of an abuse of discretion, a trial court's decision bearing upon the custody of minor children will not be disturbed on appeal. *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989). A judicial abuse of discretion exists when the trial judge's reasons or rulings are clearly untenable such as to unfairly deprive a litigant of a substantial right and a just

result. *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996). See *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

## IV. ANALYSIS

### 1. TEMPORARY CUSTODY

Dennis argues that the district court abused its discretion in allowing Thomas to reside with Karla in Colorado during the pendency of the custody litigation under a "temporary order." While there is a jurisdictional issue as to whether Dennis has timely appealed this issue, we need not decide this issue because of the result we reach. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court need not address issue not necessary to decision).

### 2. GRANTING KARLA PERMISSION TO MOVE THOMAS TO COLORADO

An award of custody of a child to a parent should not be interpreted as a sentence of immobilization. *Vanderzee v. Vanderzee*, 221 Neb. 738, 380 N.W.2d 310 (1986). However, the custodial parent has the burden of proving to the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent, before a court will permit the removal of a child from the jurisdiction. See, *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999); *Harder, supra.*

In the context of determining the best interests of a child in a case where the custodial parent petitions to move out of the jurisdiction with the minor child, there are three broad considerations: (1) each parent's reasons or motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial parent. See *Farnsworth, supra.*

### (a) Each Parent's Motives

In *Farnsworth*, the court wrote:

As stated earlier, the legitimacy of the custodial parent's motive for moving is already a threshold question in our

state. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). However, we recognize the wisdom in having both parents' motives play a further role in ascertaining a child's best interests. Thus, if a trial court finds the custodial parent's motives for moving are legitimate, the court should go on to consider the motives of each parent, in proposing and resisting the move, in its analysis of the child's best interests. While some legitimate motives might seem less compelling than others—for example, meeting the demands of a second marriage as compared to accommodating a specific health concern—none should be summarily rejected at this stage of the analysis without weighing the other considerations and how they all come to bear on the overall impact on the child.

257 Neb. at 250, 597 N.W.2d at 598.

■ The Nebraska Supreme Court has found that job-related changes are legitimate reasons for moving a child out of the jurisdiction when there is a "reasonable expectation of improvement in the career or occupation of the custodial parent." *Gerber v. Gerber*, 225 Neb. 611, 619, 407 N.W.2d 497, 503 (1987). See, also, *Farnsworth, supra*; *Jafari v. Jafari*, 204 Neb. 622, 284 N.W.2d 554 (1979) (custodial parent's new job included small increase in salary and increased potential for salary advancement).

We first note that despite the established law of this state and an express provision of the decree and property settlement so reminding Karla, she left the state with Thomas without prior court approval. She was also, without the benefit of an evidentiary hearing, able to secure a district court order allowing her to stay in Colorado with Thomas during the pendency of the matter. Finally, it appears that the matter was pending an unusually long time between the filing of Karla's request for permission to remove and Dennis' opposition thereto, and the district court's decision. This delay spanned more than 13 months. Being allowed to stay in Colorado enabled Karla to accumulate evidence of Thomas' satisfactory adjustment to the move, which would not ordinarily have been available to her.

Except for an affirmative answer to one leading question from her counsel directly suggesting to Karla that her move was in

part motivated by improved job opportunities, the credible evidence establishes only one reason for the move. That reason was to get away from a boyfriend, because that relationship was not going well. There was no history of or threat of violence on Brazil's part, and the record shows that Karla was living with Brazil when she decided in a matter of 3 or 4 days to pack up and move to Colorado. At the time she moved to Colorado, Karla had no job, no car, and no housing. In short, the record establishes an impulsive act which had the effect of removing Thomas from this jurisdiction, placing him 547 miles from Dennis and all other members of his large extended family, except Karla's sister who lives 20 miles from Estes Park. There was no evidence that Brazil posed any physical threat to Thomas or Karla or that she had tried to solve the "Brazil problem" by a less drastic tactic, like simply moving out of his house. The evidence does show that Brazil was deeply involved with Karla, and Brazil said that he might have followed her had she moved elsewhere in Nebraska and that he even thought about following her to Colorado, but he acknowledged that "it's over." We must presume that the law would have protected Karla from Brazil if there was really a need or danger. Given these facts, we conclude that Karla had no legitimate reason for leaving Nebraska.

Dennis resisted the move on the basis of the reduction in the quality and frequency of his visits with Thomas, as well as the higher costs and dangers associated with the traveling involved in visitation after the move. He also feels that the environment in Estes Park is not as good for Thomas as his previous environment in Nebraska. Dennis' resistance to Thomas' removal is neither in bad faith nor for manipulative purposes. As stated earlier, Dennis desires to maintain frequent and regular contact with Thomas and is also concerned for Thomas' safety. We find Dennis' motive for resisting the move to be legitimate. The first factor from *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), clearly militates against the move.

### (b) Quality of Life

The second consideration is whether the move holds the potential for enhancing the quality of life for the child and custodial parent. In *Farnsworth, supra,* the Nebraska Supreme

Court stated that there are a number of factors that may be used to assess this second consideration. These include (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent.

As for the quality of the relationship between Thomas and each parent, the record suggests that both Karla and Dennis have a close, nurturing relationship with Thomas. Both spend quality time with Thomas, and each involves him in appropriate activities when they are together. For example, Dennis takes Thomas hunting, fishing, camping, and to church and ensures that Thomas spends time with Dennis' large extended family. Karla takes Thomas to his sports activities, takes him on vacations, and regularly attends church with him.

Karla's income has increased from $100 per week from her part-time employment in Wahoo, which was apparently all she needed in order to meet her obligations, to $350 per week from waitressing at Ed's Cantina in Estes Park. It is difficult to conclude that this economic change enhances the quality of life for Thomas and Karla to the point that it justifies allowing her to move. The increased income appears to be of minor consequence since Karla now pays $600 per month in rent and formerly lived with Brazil, apparently at little or no cost, and rented out the home she owned in Weston for $500 per month. The evidence was that she did not have a job at the time of the move, she had not looked for a job in Colorado, and she had not looked for a better job in Nebraska before moving. This is consistent with her testimony that she moved to escape Brazil, with whom she could no longer get along. Moreover, when the employment

consequence of the move is waitressing at Ed's Cantina in Estes Park, without any evidence that similar work is unavailable in the Wahoo and eastern Nebraska area, Karla is displaying a disconcerting degree of impulsiveness, with little regard for the relationship of Thomas and Dennis. At best, on this record, Karla's job in Estes Park is an after-the-fact nominal justification. We cannot conclude that Thomas' life has been enhanced by Karla's waitressing job, particularly given the complete absence of any attempt by Karla to improve her economic circumstances within the Wahoo and eastern Nebraska area where she lived.

Furthermore, in considering enhancement of life, the record shows that Thomas has a half-brother in the eastern Nebraska area with whom he had lived for the first 10 years of his life. John has resided on a farm near Spalding with his father for the past 2 years. Although there were normal "brotherly difficulties" between the two boys, they bonded together in the same household and continued to visit after John went to live with his father. This relationship is obviously adversely impacted by Karla's move to Colorado. Additionally, Dennis has a large family in the Spalding and eastern Nebraska area, including five sisters, four brothers, and his parents, plus Karla's mother lives in Spalding. Karla acknowledged the obvious: Continued contact and relationships with extended family are important. While Karla has a sister living 20 miles away from her in Colorado, all of the rest of Thomas' family is in Wahoo and Spalding.

An attempt was made to justify the move on the ground of after-the-fact excellent performance by Thomas in school in Estes Park. But, from this record, Thomas appears to be a child who would adjust to, adapt to, and do well in most any place. In short, he was a good student in Wahoo at the parochial school and is a good student at the public school in Estes Park. While Karla also attempts to justify the move on the ground of the enhanced recreational opportunities for Thomas such as skiing, mountain climbing, and hiking in Colorado, a finding of enhancement by this court because of those things would put this court's "Chamber of Commerce" seal of approval on residing in the mountains. The reality is that a child relegated to growing up on the plains of Nebraska, rather than the mountains

of Colorado, is in a good or bad place because of the love, support, and nurturing of his family and friends, not because of differing geography. While the mountains of Colorado are admittedly quite beautiful and offer abundant recreational opportunities, the mountainous environment hardly justifies the damage to the father-son relationship that this move engenders. Estes Park and Wahoo are undoubtedly different places; however, we are unprepared to say that one is better than the other. The record provides no evidence that Thomas' life has been enhanced except in the most superficial of ways by the move to Colorado.

Of the nine components in this category from *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), Karla has failed to prove a change in any real way to enable us to conclude that Thomas' or Karla's life is enhanced to the point where the move can be justified.

(c) Impact on Noncustodial Parent's Visitation

The third factor is the impact of the move on the contact between the child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. In *Farnsworth*, the court said of this final factor:

[T]his consideration focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship. *Tropea v. Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 575 (1996). When looking at this consideration, courts typically view it in the light of the potential to establish and maintain a reasonable visitation schedule. See, e.g., *Cooper v. Cooper*, 99 N.J. 42, 491 A.2d 606 (1984).

Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *In re Marriage of Herkert*, 245 Ill. App. 3d 1068, 615 N.E.2d 833, 186 Ill. Dec. 29 (1993). Indications of the custodial parent's willingness to comply with a modified visitation

schedule also have a place in this analysis. *Jones v. Jones*, 110 Nev. 1253, 885 P.2d 563 (1994).
257 Neb. at 251, 597 N.W.2d at 599.

Under the original decree, Dennis had substantial visitation which was readily exercised when Dennis, Karla, and Thomas were in the same community. That visitation included every other weekend, one weeknight a week, 2 weeks in the summer, and various holidays. Dennis testified that he has seen Thomas approximately one weekend a month since Karla moved to Colorado. The distance between Wahoo and Estes Park is 547 miles, and the parties meet halfway in the North Platte area. Thus, the exercise of visitation involves lots of "windshield time" for Thomas. In short, Karla's move to escape Brazil puts Thomas "on the road" for 1,100 miles for weekend visitation. Because of time, distance, and the cost of exercising visitation, Dennis no longer sees Thomas every other weekend or for the one weeknight that was previously provided for in the decree. The trial judge added two additional weeks in the summer to help account for some lost time during the rest of the year. Dennis testified that the quality of the visitation has decreased due to the traveling involved to see Thomas.

Karla testified that she did not intend for the move to have an impact on Dennis' relationship with Thomas and has been voluntarily meeting Dennis halfway between Estes Park and Wahoo in order for Dennis to see Thomas. It appears that Karla is willing to comply with any reasonable visitation schedule ordered by a court.

While we recognize that *Farnsworth* does not really weigh one factor over another, there is obviously some balancing which must go on in the mind of any judge who must decide these most difficult questions. That balancing inherently seems to require the weighing of the legitimacy of the move against the impact on the noncustodial parent. This case emphasizes that such a balancing process is valid and important. As recounted above, the record shows a move for superficial, impulsive, and self-centered reasons by Karla. Any nominal proof of enhancement of Thomas' life was generated after the fact. Given that there was no evidence that Thomas was doing poorly in his school or homelife in Wahoo, the fact that he has done well in

Estes Park is really not determinative. In short, he was a good boy in Wahoo, as he is in Estes Park. What is more meaningful, on this record, is that he had a significant, constant, loving, and life-enhancing relationship with Dennis when they resided in the same community. At a time when divorce is commonplace, with the resulting separations of parents and children, our legal system should encourage and support those fathers who shoulder their responsibilities and want to be a positive force in their children's lives. Dennis has not missed any child support, has consistently exercised visitation, and has a healthy and normal relationship with Thomas, and that should not be lightly cast aside in favor of an arrangement which requires him to undertake a 10-hour round trip to meet Karla in the North Platte area to get Thomas. There is then essentially a day of visitation followed by another 10-hour journey to return Thomas. Thus, Thomas is subjected to the hazards (and boredom) of continual long-distance travel while the quality of the time between Dennis and Thomas deteriorates. The current arrangement is highly detrimental to Dennis' visitation rights and his relationship with Thomas.

### (d) Conclusion as to Three *Farnsworth* Factors

Karla's proposition to the district court was more or less: "I have no car, no job or housing in Colorado, my boyfriend has never hurt me or my child, but I want to get away from him. While my son does well in school and at home, has extensive family and a good and loving father in Wahoo, I still want to take him 547 miles away from his father. Can I do that?" We do not hesitate to say that the trial judge should have denied this request and that there was an abuse of discretion in failing to do so. The request was shallow and self-centered, but unfortunately, it was not revealed as such until an evidentiary hearing occurred 13 months after the fact—and then the trial court's predominant reasoning seemed to be that it was then too late to say no. However, Karla should not be rewarded for her violation of the law; nor should we let manufactured and superficial justification stand in the way of the correct result.

In conclusion, Karla's reason for moving had nothing to do with job opportunities or career, or even avoidance of a violent

relationship with Brazil. They had stopped getting along, and it was easiest to simply leave—irrespective of damage to Dennis and Thomas' relationship. It was an impulsive but convenient way to put some distance between Karla and Brazil because the relationship had soured. But, it was at the core a selfish act because it removed Thomas from Dennis, his extended family, his school, and his friends upon the thinnest justification imaginable. The record is bereft of evidence of life enhancement for Thomas or Karla by virtue of being in Colorado other than superficial things such as the presence of the mountains and hiking. The move has substantially interfered with Dennis' relationship with Thomas. Thomas is also harmed by being removed from an extensive and involved extended family, including a half-brother. While we acknowledge the concern of making things worse by dragging Thomas back to Nebraska, Karla's impulsive behavior, which violated Nebraska law at the outset, should not dictate the outcome. The district court abused its discretion in granting Karla permission to remove Thomas from Nebraska.

### 3. DENYING DENNIS' APPLICATION TO MODIFY

Dennis argues that the district court erred in not modifying the decree to grant him sole custody of Thomas. Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the minor child require such action. *Sullivan v. Sullivan*, 249 Neb. 573, 544 N.W.2d 354 (1996); *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996); *Kennedy v. Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986). The party seeking modification of child custody bears the burden of showing that a material change in circumstances has occurred. *Sullivan, supra*; *Smith-Helstrom, supra*; *Kennedy, supra.* ·

Dennis does not allege that Karla is an unfit parent to Thomas. Therefore, we must assess whether Dennis has shown that there has been a material change of circumstances and that giving Dennis sole custody is in Thomas' best interests. The primary "material change" that Dennis advocates is Karla's move to Colorado. At trial, Dennis attempted to show that Estes Park

was not as safe as the Wahoo area, that the traveling associated with exercising visitation involves risks and fatigue, and that the reduction in visitation deprives Thomas of meaningful time with Dennis.

Dennis also argues that there was a lack of stability in Karla's household which warrants a change in custody. He attempted to show this by offering evidence of Karla's various jobs she has held over the years, her moves, her relationship with Brazil, and the move to Colorado. We agree with Dennis that the unjustified and impulsive move to Colorado constituted a material change. We now address Thomas' best interests.

In determining a child's best interests for purposes of custody and visitation matters, Neb. Rev. Stat. § 42-364(2) (Reissue 1998) provides that the factors to be considered shall include, but not be limited to, the following:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child; and

(d) Credible evidence of abuse inflicted on any family or household member. . . .

Additionally, a court may consider other factors in determining a child's best interests in custody matters, including the moral fitness of the child's parents and the parents' sexual conduct, the attitude and stability of each parent's character, and the parental capacity to provide physical care and satisfy the educational needs of the child. See, *Smith-Helstrom, supra*; *Hoins v. Hoins*, 7 Neb. App. 564, 584 N.W.2d 480 (1998).

Thomas' relationship with both Dennis and Karla is and has been good. There has been no allegation of abuse, nor has Thomas expressed a preference to live with one parent rather than the other. Karla has had one relationship, with Brazil, since the parties' divorce. Karla testified that she and Brazil lived

together on two different occasions; however, Karla and Brazil are no longer together. Dennis does not claim that Karla is unable to care for Thomas, and it was shown at trial that Karla is able to satisfy Thomas' educational and other needs. Thomas is a healthy, happy boy, who has lived with Karla since the parties' divorce over 7 years ago.

While we have determined that Thomas should return to Nebraska, Dennis has not made the requisite showing that Karla's retention of custody of Thomas is not in Thomas' best interests. The evidence shows that Thomas is a healthy, smart, happy, normal, outgoing boy, and we must give some credit for that to Karla's care, which is not to say that he would not do equally well with Dennis. A change in custody is not in Thomas' best interests, unless Karla determines that she will not return to Nebraska. Therefore, assuming that she returns to Nebraska, Karla should maintain the physical custody of Thomas. We find that the district court did not abuse its discretion in denying Dennis' request for modification to place custody with him.

## V. CONCLUSION

While we find that Karla can retain physical custody of Thomas, we find that it is not in Thomas' best interests to remain in Colorado. Karla testified that she would return to Nebraska in order to retain custody of Thomas. Therefore, in accord with our conclusion that the district court abused its discretion in allowing Karla to remove Thomas to Colorado, but that it is in his best interests to remain in Karla's custody, we find that physical custody shall remain with Karla, unless she refuses to move Thomas back to Nebraska no later than June 15, 2000. We select that date as it is after the completion of the present school year and we wish to avoid any further disruption in Thomas' life. Should Karla fail to return to Nebraska by that date, a matter which the district court should oversee as necessary in accordance with our opinion, then the district court shall order physical custody of Thomas to be placed with Dennis, who the record reveals is also a fit and proper person to have physical custody of Thomas.

AFFIRMED AS MODIFIED.

HANNON, Judge, dissenting.

I must respectfully dissent. If I were the trial judge, I would not have allowed Karla to move to Colorado with Thomas. However, the applicable standard of review is as follows:

> Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Poll v. Poll*, 256 Neb. 46, 588 N.W.2d 583 (1999). A judicial abuse of discretion requires that the *reasons or rulings of a trial judge be clearly untenable* insofar as they unfairly deprive a litigant of a substantial right and just result. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

(Emphasis supplied.) *Farnsworth v. Farnsworth*, 257 Neb. 242, 248, 597 N.W.2d 592, 597 (1999).

Untenable is defined as "incapable of being defended, as an argument, thesis, etc.; indefensible." Webster's Encyclopedic Unabridged Dictionary of the English Language 1567 (1989). I do not think one can say the trial judge's reasons are "untenable," let alone "clearly untenable." I do not think we can say the trial judge abused his discretion in this case. Therefore, I would reluctantly affirm.